# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIBEL GUTIERREZ,<br><br>        Plaintiff,<br><br>    v.<br><br>NANCY A. BERRYHILL[1],<br>Acting Commissioner of Social Security,<br><br>        Defendant. | Case No.: 1:16-cv-00141 - JLT<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT, NANCY A. BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF MARIBEL GUTIERREZ |

Plaintiff Maribel Gutierrez asserts she is entitled to disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Plaintiff seeks judicial review of the decision denying her applications for benefits, asserting the administrative law judge ("ALJ") erred in evaluating the medical record. Because the ALJ applied the proper legal standards and the decision is supported by substantial evidence in the record, the administrative decision is **AFFIRMED**.

## **BACKGROUND**

Plaintiff filed applications for benefits on February 29, 2012, in which she alleged disability beginning December 9, 2009. (Doc. 9-3 at 21) The Social Security Administration denied the applications at the initial level and upon reconsideration. (*Id.*; Doc. 10-5 at 2-6, 10-14) Plaintiff

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court substitutes Nancy A. Berryhill for her predecessor, Carolyn W. Colvin, as the defendant.

1

requested a hearing, and testified before an ALJ on April 19, 2013. (Doc. 9-3 at 21, 43) The ALJ determined Plaintiff was not disabled under the Social Security Act, and issued an order denying benefits on May 31, 2013. (*Id.* at 21-32) Plaintiff filed a request for review of the decision with the Appeals Council, which denied the request on October 8, 2014. (*Id.* at 2-4) Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security.

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v.*

*Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

### A.  Relevant Medical Evidence

Plaintiff slipped and fell while working on November 30, 2007, and suffered a tibial plateau fracture. (Doc. 11-9 at 49) The following month, Plaintiff had an "[o]pen reduction and internal fixation of [the] fracture," for the placement of "a locking tibial buttress plate." (*Id.*) Plaintiff returned to work on March 10, 2018 but "complained of persistent leg pain and also low back pain." (*Id.* at 76)

In July 2009, Plaintiff underwent x-rays on her left knee. (Doc. 11-9 at 10) Dr. Hon Woo opined Plaintiff had "[s]light narrowing of the medial joint space." (*Id.*) Dr. Woo found "no loosening of the surgical hardware" and no "significant spurs or erosions… at the joint space." (*Id.*)

In October 2009, Plaintiff was diagnosed with "internal derangement with symptomatic hardware[]" and her physicians determined the plate needed to be removed. (*See* Doc. 11-9 at 4-5, 42-44) Dr. Peter Simonian performed the hardware removal on December 10, noting he took out "7 screws and 1 plate" during the procedure. (*Id.* at 5)

Plaintiff received a referral to physical therapy, which she began on January 5, 2010. (*See* Doc. 11-9 at 55-56) On February 11, Chris Lewis, the physical therapist, determined that Plaintiff showed "some progress" with decreasing her pain and increasing her range of motion, strength, and function. (*Id.* at 55) On February 24, Plaintiff again reported a decrease in pain and demonstrated additional

progress with increasing strength. (*Id.* at 52) Mr. Lewis noted that Plaintiff's range of motion remained the same but Plaintiff "tolerated treatment well." (*Id.*) In March 2010, Mr. Lewis noted Plaintiff had "shown good overall progress" though she had "continued complaints of left knee pain especially with increased time up on feet and at end range flexion." (*Id.* at 51, emphasis omitted) In addition, he found "good progress in strength and tolerance to [the] exercise program," noting pain was the "primary limiting factor." (*Id.*, emphasis omitted)

Between March 18 and April 1, 2010, Plaintiff received three Euflexxa injections in her left knee. (Doc. 11-9 at 23-34) Although Plaintiff requested Norco, Dr. Simonian informed her that he "would rather not continue to give pain medication on a regular basis for a chronic condition like arthritis." (*Id.* at 34)

Plaintiff had an MRI taken on her left knee on April 19, 2010. (Doc. 11-9 at 31) The MRI showed Plaintiff had "mild arthritis" and "otherwise no significant abnormalities." (*Id.*) Upon examination, Dr. Simonian found Plaintiff had "mild discomfort" with medial and lateral movements."

In May 2010, Plaintiff again had x-rays taken of her left knee. (Doc. 11-9 at 12) Dr. Woo determined Plaintiff had "[m]ild narrowing at the medial joint space." (*Id.*) Dr. Woo compared the images to those taken in July 2009, and noted Plaintiff's facture "appear[ed] to be completely healed." (*Id.*) Further, Dr. Woo opined that Plaintiff's "lateral and patellofemoral joints appear[ed] fairly maintained." (*Id.*)

Dr. Michael Charles performed a consultative examination related to Plaintiff's workers' compensation claim on July 19, 2010. (Doc. 11-13 at 48-53) Plaintiff reported she had "severe sharp stabbing pain on a daily basis" in her left knee, which was "made worse with bending, walking and squatting." (*Id.* at 50) In addition, she told Dr. Charles she had "sharp, stabbing pains" in her right knee and neck. (*Id.*) Dr. Charles noted that Plaintiff "walk[ed] into the examining room with a cane, hunched forward, [with an] antalgic gait, favoring the left lower extremity." (*Id.* at 51) Dr. Charles found Plaintiff "had tenderness throughout the cervical and lumbar region," and "diffuse tenderness" in the left knee. (*Id.*) Based upon his review of prior x-rays, Dr. Charles believed that Plaintiff's pain from the hardware was caused by a screw being placed "much too long," and "impinging into the soft tissue of her lower leg." (*Id.* at 52) Dr. Charles opined that Plaintiff was "getting a lot better" after the

4

hardware removal, physical therapy, and injections. (*Id.*) However, he believed Plaintiff would "eventually need a total knee replacement." (*Id.* at 53)

Plaintiff had a follow-up regarding "chronic leg pain" with Dr. Diego Allende in January 2011. (Doc. 11-10 at 35) Dr. Allende observed that Plaintiff was "really obese" and walked "with an antalgic gait favoring the left side." (*Id.*) He found Plaintiff exhibited "a lot of pain" and tenderness in the knee. (*Id.*) Plaintiff continued to exhibit pain and walk with an antalgic gait the following month. (*Id.* at 33) Plaintiff also reported she was "unable to sleep… [and] having a lot of anxiety at night." (*Id.*)

In March 2011, Plaintiff told Dr. Allende that she was taking her medication daily but still had "consistent knee pain." (Doc. 11-10 at 29) Plaintiff reported the pain had "increased over a period of time within the past couple of weeks." (*Id.* at 27) She also stated that she was trying "to walk to help the knee pain subside" and exercise, because she knew that if she lost weight it would "help with the pain subsiding as well." (*Id.* at 29) Dr. Allende observed that Plaintiff needed "assistance getting up" during the examination, and he believed physical therapy would help increase her range of motion. (*Id.* at 29-30) She continued to report pain in April and May, and Dr. Allende refilled her pain medication. (*Id.* at 24- 26)

An MRI was taken of Plaintiff's lumbar spine on May 21, 2011. (Doc. 11-11 at 54-55) According to Dr. Brenda Safranko, Plaintiff's lumbar spine had "normal vertebral body height and alignment." (*Id.* at 54) She found "a 2 mm annulus bulge" at the L4-5 level, and "minimal narrowing of the neural foramina by [the] disk bulge." (*Id.*) Dr. Safranko found no disk protrusions or narrowing at the other levels of Plaintiff's lumbar spine. (*Id.*)

Plaintiff had a follow-up appointment in July 2011 with Dr. Allende, to whom she reported her pain—in her low back and left knee— was "a consistent 9/10 throughout the day." (Doc. 11-10 at 19) Plaintiff said she was "trying to exercise and swim to help the pain subside," and reported the exercise "help[ed] for a short period of time," but offered no permanent relief. (*Id.*) Dr. Allende observed that Plaintiff had "some popping and crepitus in her left knee," which was also "swollen and tender to the touch." (*Id.*) Dr. Allende recommended Plaintiff "continue with [the] swimming exercises to help with the mobility of her knee." (*Id.* at 20) Plaintiff continued to report pain in her low back and knee throughout August and September. (*Id.* at 15-17)

At an appointment with Dr. Allende on December 1, 2011, Plaintiff needed "to use an ambulatory device to walk." (Doc. 11-1 at 12) Dr. Allende noted Plaintiff had "tenderness with her lumbar spine … and some guarding." (*Id.*) In addition, he found Plaintiff's left knee had "significant valgus strain," swelling, and tenderness. (*Id.*) Dr. Allende opined that Plaintiff had "developed a derivative low back injury, discopathy of some sort." (*Id.* at 13)

Dr. Timothy Watson performed a consultative examination in December 2011 due to Plaintiff's complaints of low back pain. (Doc. 11-9 at 19) In addition, Plaintiff told Dr. Watson that she had "some weakness about the left ankle." (*Id.*) She said "25% of the pain is in her neck, 25% is in her low back, 25% is in the mid back, and 25% is in her leg." (*Id.*) Plaintiff said she could not "lift or carry anything," could "only walk using a stick or crutches," was unable to stand or sit for "for more than 10 minutes," and the pain disrupted her sleep. (*Id.*) Dr. Watson determined Plaintiff had a "decreased active range of motion" in her lumbar spine. (*Id.* at 22) Dr. Watson noted he could not "find [an] objective basis for her pain," because there were "[n]o degenerative signs in her discs in her back," and "[n]o evidence of disc herniations." (*Id.* at 23) He concluded there "may be a component of symptomatic fixation," and recommended Plaintiff continue "conservative care" with an "[e]mphasis … on core strengthening, cognitive training, and return to work efforts." (*Id.*)

Plaintiff had an MRI of her left knee taken on January 6, 2012, which showed "evidence of [the] previous open reduction internal fixation with no abnormalities otherwise. (Doc. 11-9 at 28) Due to "ongoing pain," Plaintiff decided to receive "a corticosteroid injection to see if it [gave] her any relief." (*Id.*) Dr. Simonian administered the injection on January 18, noting there "may not be anything more" that could be done for Plaintiff. (*Id.*)

In February 2012, Plaintiff had a nerve conduction study and electromyography ("EMG") to determine the extent or presence of radiculopathy. (Doc. 11-9 at 76-77) Dr. Do opined Plaintiff had normal senses, but the motor nerve study results were "suboptimal" due to Plaintiff's morbid obesity. (*Id.* at 78)

On March 2, 2012, Dr. Simonian met with Plaintiff regarding her results from the EMG and nerve conduction study of her lower left leg. (Doc. 11-9 at 27) Plaintiff told Dr. Simonian that the "injection provided some mild relief." (*Id.*) Dr. Simonian informed Plaintiff that he "did not think

there was more that could be done." (*Id.*) He said he "was not recommending knee arthroplasty because her arthritis [was] not that significant." (*Id.*)

In April 2012, Plaintiff had a follow-up with Dr. Allende regarding her "chronic knee pain." (Doc. 11-10 at 3-4) Dr. Allende observed Plaintiff had "some left knee discomfort and some swelling," but her range of motion was "intact." (*Id.* at 3) Dr. Allende "tend[ed] to agree with" Dr. Simonian that there was nothing else that he could do for Plaintiff. (*Id.*) Dr. Allende opined Plaintiff was "stable on medications" and provided a three-month supply. (*Id.* at 4) He also opined Plaintiff was "permanently impaired in that she is prohibited from frequent repetitive bending, stooping or kneeling or any other types of comparable effort." (*Id.*)

Dr. W. Jackson reviewed the record and completed a physical residual functional capacity assessment on July 27, 2012. (Doc. 11-4 at 9-11) Dr. Jackson believed Plaintiff was able to lift and carry 10 pounds frequently, stand or walk for a total of two hours, and sit "[a]bout 6 hours in an 8-hour workday." (*Id.* at 9-10) He determined that Plaintiff had limited ability to use foot controls in her left leg. (*Id.* at 10) In addition, Dr. Jackson believed that "due to knee and back pain," Plaintiff was limited to occasionally climbing ramps or stairs, balancing, stooping, kneeling, crouching, and crawling; and could never climb ladders, ropes, or scaffolds. (*Id.*) Accordingly, he concluded Plaintiff was limited to sedentary work. (*Id.* at 11)

Dr. Roger Fast also reviewed the record in January 2013 and opined that Plaintiff's subjective complaints were not credible "to the alleged level of severity." (Doc. 11-4 at 52) He found that Plaintiff's "[p]hysical findings [were] mild to moderate," and the treatment she received was "mild and not supportive of the alleged level of impairment." (*Id.*) Dr. Fast affirmed the findings of Dr. Jackson, opining the limitation to sedentary work "seem[ed] reasonable given [Plaintiff's] morbid obesity in addition to her back and knee injuries." (*Id.* at 54)

On April 12, 2013, Plaintiff had x-rays taken of her knee. (Doc. 11-13 at 27, 29) Dr. Leskovar reviewed the images and found knee spaces were "well maintained," and there were "no focal bony lytic or erosive lesions" or "significant degenerative change[s]." (*Id.*) Dr. Leskovar concluded there were "[n]o significant plain film bony abnormality" in the left or right knee. (*Id.*)

Dr. Charles performed another consultative examination on April 24, 2013. (Doc. 11-3 at 20-

26) Plaintiff used a cane when she entered the room for the examination and told Dr. Charles that she had pain in both legs that felt like "burning on a daily basis." (*Id.* at 21-22) In discussing her activities of daily living, Plaintiff reported:

> [S]he has to rely on external aids for support. She has difficulty arising from both seated chairs, uneven ground. She cannot lift or carry anything at all. She is unable to climb a flight of stairs, [has] a lot of difficult sitting, standing, grasping from shelves at eye level or above.

(*Id.* at 25) Dr. Charles found Plaintiff had negative straight leg raise tests and "normal range of motion of the lumbar spine." (*Id.* at 22) However, he also determined Plaintiff had "limited range of motion of the left knee." (*Id.*) According to Dr. Charles, Plaintiff's back pain was, "within reasonable medical probability, secondary to her dysfunctional gait." (*Id.* at 24) Reviewing Plaintiff's x-rays, he believed Plaintiff would "require a total knee replacement at some point in time." (*Id.*) Dr. Charles concluded that Plaintiff was "restricted from repetitive bending, stooping, lifting, prolonged standing, kneeling, climbing, [and] prolonged walking." (*Id.* at 26) Further, Dr. Charles opined Plaintiff would "need a cane for assistance in ambulation." (*Id.*)

Dr. Bernardo Butuin completed a physical residual functional capacity statement on March 27, 2014. (Doc. 11-14 at 22-25) He noted that he had treated Plaintiff for two years, every three months. (*Id.* at 22) According to Dr. Butuin, Plaintiff's symptoms included pain that was "9/10" in her left knee, which was aggravated by walking and bending. (*Id.*) He opined Plaintiff's "most significant clinical findings and objective signs" included "constant pain [in the left] knee, unstable in moving, & morbid obesity." (*Id.*, emphasis omitted) Dr. Butuin indicated Plaintiff "constantly" experienced pain and stress "severe enough to interfere with attention and concentration needed to perform simple work tasks." (*Id.*) He believed Plaintiff was unable to walk a city block without rest or severe pain; sit more than thirty minutes; stand more than thirty minutes; walk more than ten minutes; or climb stairs, ladders, scaffolds, ropes, or ramps. (*Id.* at 23, 25) He opined Plaintiff had limitations with reaching, handling, and fingering; and she could carry only up to five pounds. (*Id.* at 24) Finally, Dr. Butuin concluded Plaintiff would need unscheduled breaks on a daily basis, to rest for thirty minutes every two hours, and would be off task for "[m]ore than 30%" of her workday. (*Id.* at 24-25)

///

### B. Administrative Hearing Testimony

Plaintiff testified before the ALJ at a hearing on April 9, 2014. (Doc. 11-3 at 27) She reported that she did not have vocational training or a specific trade that she learned. (*Id.*) Plaintiff said she worked for Cal Citrus for twenty-one years, grading oranges. (*Id.* at 33-34) She stated her last day of work was on December 9, 2009—the day before her surgery to remove the screws and plate in her leg—and she had not looked for employment since that date. (*Id.*) Plaintiff believed she was no longer able to work due to her left knee problems. (*Id.* at 35)

Plaintiff said her pain "got worse" after the pins were removed. (Doc. 11-3 at 36) She explained that "the pins were destroying the tissue" and as a result, her knee and "whole leg" would swell every day. (*Id.* at 36-37) Plaintiff stated she received physical therapy, hot patches, and medication, but the treatments did not help. (*Id.* at 37) Plaintiff described the pain as an "eight" on a scale of ten, and reported she would take two Norco pills each night to decrease the pain level. (*Id.* at 37-38)

She said on a typical day she would awaken at 5:00 a.m. to make coffee and something for her husband to eat, after which she would "go back to sleep and… wake up like around 9:30 to have breakfast." (Doc. 11-3 at 38-39) Plaintiff testified that after breakfast, she would "watch the soap operas for a little bit and then… get tired and…go to sleep for a couple of hours." (*Id.* at 39) She reported she did not "get dressed" and remained in her nightgown. (*Id.*) Plaintiff said she bathed when her husband came come because her "tub is too tall" and she could not lift her leg by herself. (*Id.*) Plaintiff reported that she would "clean a couple of dishes and that's it," and her husband took care of the rest of the housework. (*Id.*)

She testified that she used a cane "all the time… to stand up or to walk." (Doc. 11-3 at 42) Plaintiff estimated that she could be on her feet "like an hour…[a]t one time" before she needed to sit. (*Id.* at 43) In addition, she believed she could sit for two hours each day. (*Id.*) She explained that the rest of the day she was "[l]aying down," not standing or sitting. (*Id.* at 44)

### C. The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial activity after the alleged disability date of December 9, 2009. (Doc. 11-3 at 14) Second, the ALJ

found Plaintiff "internal derangement of the left knee status-post tibial plateau fracture, chronic low back pain involving L4-L5 annulus bulge, [and] morbid obesity." (*Id.*) These impairments did not meet or medically equal a listed impairment. (*Id.* at 15) Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to lift and carry 10 pounds occasionally, less than 10 pounds frequently, sit 6 hours, and stand and walk 2 hours in an 8-hour workday with normal breaks. She can push and pull as much weight as [she] can carry and must use a cane to ambulate. She can occasionally climb ramps and stairs, operate foot controls with the lower left extremity, balance, stoop, kneel, crouch, and crawl, but should never climb ladders, ropes, or scaffolds. In addition, she must avoid concentrated exposure to unprotected heights, moving mechanical parts, operating motor vehicles, extreme cold and extreme heat. Lastly, she will be off tasks 5% of the workday due to the limiting effects of chronic low back pain [citation].

(*Id.*) With this residual functional capacity, the ALJ found Plaintiff was "unable to perform any past relevant work." (*Id.* at 18) However, the ALJ determined there were "jobs that exist in significant numbers in the national economy that the claimant can perform." (*Id.* at 19) Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 19-20)

## **DISCUSSION AND ANALYSIS**

Appealing the ALJ's decision, Plaintiff argues that the ALJ failed to properly evaluate the opinion of Dr. Bernado Butuin. (Doc. 14 at 8-12) According to Plaintiff, "the ALJ failed to articulate specific and legitimate reasons for rejecting Dr. Butuin's opinion." (*Id.* at 12) On the other hand, Defendant contends, "the ALJ properly evaluated Dr. Butuin's opinion, and remand would be inappropriate in this case." (Doc. 17 at 14)

### **A.    Evaluation of the Medical Record**

In this circuit, the courts distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). In general, the opinion of a treating physician is afforded the greatest weight but it is not binding on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Further, an examining physician's opinion is given more weight than the opinion of non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

A physician's opinion is not binding upon the ALJ, and may be discounted whether or not

another physician contradicts the opinion. *Magallanes*, 881 F.2d at 751. An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only by identifying a "clear and convincing" reason. *Lester*, 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence in the record." *Id.*, 81 F.3d at 830. When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). Here, Plaintiff contends the ALJ erred in evaluating the opinions of Dr. Butuin, a treating physician. Because the limitations Dr. Butuin assessed were contradicted by other physicians—including Drs. Watson, Jackson, and Fast— the ALJ was required to identify specific and legitimate reasons for rejecting Dr. Butuin's opinions.

The ALJ indicated she gave "little weight" to the opinions of Dr. Butuins concerning the Plaintiff's residual functional capacity. (Doc. 11-3 at 17) The ALJ noted:

> Dr. Butuin opined the claimant could lift and carry less than 5 pounds constantly, sit 2 hours, and stand and walk less than 1 hour in an 8-hour workday. He further opined she would need daily 30-minute unscheduled breaks every 2 hours to sit in an 8-hour workday. He also opined she would need a cane to ambulate, would be off task more than 30% in an 8-hour workday, and would [be] absent 5 days or more per month.

(*Id.*) The ALJ found these opinions were "overly restrictive" and concluded "the medical evidence of record [did] not support" the limitations. (*Id.*)

The Ninth Circuit has determined the opinion of an examining physician may be rejected where an ALJ finds incongruity between a doctor's assessment and his own medical records, and the ALJ explains why the opinion "did not mesh with [his] objective data or history." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008). Similarly, inconsistency with the overall record constitutes a legitimate reason for discounting a physician's opinion. *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 602-03 (9th Cir. 1999); *Warre v. Comm'r of the Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for [disability] benefits"). To reject an opinion as inconsistent with the treatment notes or medical record, the "ALJ must do more than offer his conclusions." *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988). The Ninth Circuit explained: "To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by

the objective findings does not achieve the level of specificity our prior cases have required." *Id.*, 849 F.2d at 421-22.

In this case, the ALJ observed: "clinical findings showed normal ranges of motion of the lumbar spine and no neurological deficits." (Doc. 11-3 at 18, citing Exh. 10F, pp. 4-6 [Doc. 11-13 at 22-24]) In addition, the ALJ noted "diagnostic findings showed no abnormalities of the left knee." (*Id.* citing, Exh. 11F, p. 9 [Doc. 11-13 at 41]) Further, the ALJ found the record indicated "medications controlled [Plaintiff's] residual pain." (*Id.*, citing Exh. 6F, p. 7 [Doc. 11-10 at 8])

Plaintiff observes the medical record also includes findings from Dr. Charles that Plaintiff had "continued residual narrowing of the medial joint of the left knee compared to the right knee," as well as "definite evidence of loss of articular cartilage space, consistent with the industrial injury." (Doc. 14 at 10, citing Doc. 11-13 at 23, 38) Plaintiff also notes Dr. Charles concluded she "was precluded from repetitive lifting." (*Id.*) However, these findings do not undermine those of the ALJ that the limitations articulated by Dr. Butuin are contradicted by the record. Indeed, the ALJ gave great weight to the opinions of Dr. Charles, finding his opinion was "consistent with the medical evidence of record...." (Doc. 11-3 at 17)

Because the ALJ identified specific inconsistencies in the record, the conflict with the medical record is specific and legitimate reason for giving less weight to the opinion of Dr. Butuin. *See Thommasetti,* 553 F.3d at 1041; *see also Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003) (treating physician's opinion properly rejected where the treating physician's treatment notes "provide no basis for the functional restrictions he opined should be imposed on [the claimant]"). Moreover, the ALJ's resolution of the conflicting medical evidence must be upheld by the Court, even where there is "more than one rational interpretation of the evidence." *Allen,* 749 F.2d at 579*; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ").

**B.     Substantial Evidence Supports the ALJ's Decision**

When an ALJ rejects the opinion of a physician, the ALJ must not only identify a specific and legitimate reason for rejecting the opinion, but the decision must also be "supported by substantial

evidence in the record." *Lester*, 81 F.3d at 830. Accordingly, because the ALJ articulated specific and legitimate reasons for rejecting the opinion of Dr. Butuin, the decision must be supported by substantial evidence in the record.

The term "substantial evidence" "describes a quality of evidence ... intended to indicate that the evidence that is inconsistent with the opinion need not prove by a preponderance that the opinion is wrong." SSR 96-2p, 1996 SSR LEXIS 9 at *8[2]. "It need only be such relevant evidence as a reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion expressed in the medical opinion." *Id.*

The ALJ gave "great weight" to the limitations assessed by treating physician Dr. Allende and examining physician Dr. Charles, finding their opinions were "consistent with the medical evidence of record, … few objective findings on physical examinations, and minimal findings on MRI's [sic] of the claimant's left knee and back." (Doc. 11-3 at 17, citing Exh. 9F, p. 54 and 10F, p. 9 [Docs. 11-1 at 55, 11-13 at 27]) Likewise, the ALJ gave "great weight" to the opinion of the orthopedic examiner, Dr. Watson[3]. (*Id.*) The ALJ also gave "great weight" to the opinions of non-examining physicians, Drs. Jackson and Fast. (*Id.*) Notably, none of these physicians opined that Plaintiff was completely precluded from work or all postural activities.

Significantly, the opinion of Dr. Allende, who was a treating physician, is entitled to the greatest weight. *See Lester*, 81 F.3d at 830; 20 C.F.R. § 404.1527(d)(2). As the ALJ noted, Dr. Allende opined Plaintiff "was prohibited from repetitive bending, stooping, or kneeling, or any other types of comparable effort." (Doc. 11-3 at 17) Accordingly, the ALJ did not find Plaintiff was capable of frequent postural activities, and the opinion of Dr. Allende is substantial evidence in support of the ALJ's decision. (*See id.* at 15) In addition, the opinions of Drs. Charles and Watson constitute substantial evidence, because they "rest[] on independent examination." *Tonapetyan*, 242 F.3d at 1149; *see also Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007) (when an examining physician provides

---

[2] Social Security Rulings (SSR) are "final opinions and orders and statements of policy and interpretations" issued by the Commissioner. 20 C.F.R. § 402.35(b)(1). Although they do not have the force of law, the Ninth Circuit gives the Rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989); *see also Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006) ("SSRs reflect the official interpretation of the [SSA] and are entitled to 'some deference' as long as they are consistent with the Social Security Act and regulations").

[3] As both parties acknowledge, the ALJ identified Dr. Whyman as the orthopedic examiner, which was merely a scrivener's error.

13

independent clinical findings, such findings are substantial evidence). Finally, the opinions of Drs. Jackson and Fast—who opined Plaintiff could "perform a sedentary range of work with lower left extremity limitations"—also are substantial evidence support of the ALJ's decision, as they are consistent with the opinions of Drs. Charles and Allende. *See Tonapetyan*, 242 F.3d 1149 (the opinions of non-examining physicians "may constitute substantial evidence when. . . consistent with other independent evidence in the record"). Consequently, the ALJ's decision to give little weight to the limitations assessed by Dr. Butuin is supported by substantial evidence in the record.

## **CONCLUSION AND ORDER**

For the reasons set for above, the Court finds the ALJ applied the proper legal standards and resolved conflicts in the evidence. Because the ALJ's decision is supported by substantial evidence in the record, the Court must uphold the conclusion that Plaintiff was not disabled as defined by the Social Security Act. *Sanchez*, 812 F.2d at 510; *Matney*, 981 F.2d at 1019. Accordingly, the Court **ORDERS**:

1. The decision of the Commissioner of Social Security is **AFFIRMED**; and
2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff Maribel Gutierrez.

IT IS SO ORDERED.

Dated: **June 29, 2017**             **/s/ Jennifer L. Thurston**
UNITED STATES MAGISTRATE JUDGE